**UNITED STATES of America**

v.

**Jose MARTE, Defendant.**

No. 11 Civ. 2299(DC).
No. 08 Cr. 1131(DC).

United States District Court,
S.D. New York.

July 20, 2011.

Preet Bharara, Esq., by Antonia M. Apps, Esq., Assistant United States Attor-

ney, New York, NY, United States Attorney for the Southern District of New York.

Todd M. Merer, Esq., New York, NY, Attorney for Defendant.

## MEMORANDUM DECISION

CHIN, Circuit Judge:

On September 8, 2009, defendant Jose Marte pled guilty to one count of conspiracy to distribute and possess with intent to distribute Oxycodone, a Schedule II controlled substance, in forms commonly known as Oxycontin, Percocet, and Endocet, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). On February 3, 2010, Marte was sentenced to a term of imprisonment of 135 months. Marte now moves pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence on the grounds that (1) he was denied effective assistance of counsel; and (2) he was sentenced under an unconstitutional Guidelines sentencing scheme. For the reasons set forth below, his motion is denied.[1]

## BACKGROUND

### A. *The Facts*

In February 2008, a confidential informant told law enforcement agents that he had purchased, on several occasions, a total of approximately $10,000 worth of pharmaceutical pills, including Oxycontin, from Marte and Marte's wife. (PSR ¶ 21).[2] The subsequent investigation revealed that Marte was the ringleader of a conspiracy to buy and resell pharmaceutical pills, the active ingredient of which is Oxycodone. (PSR ¶ 20; Plea Tr. 20). Marte did not possess a license or registration to sell or buy these drugs. (PSR ¶ 20).

Marte purchased the pills from individuals he recruited who filled their Oxycontin prescriptions through the Medicaid program. (Sent. Tr. 16). Marte would arrange to drop his recruits off at a pharmacy to have their prescriptions filled, he would then purchase their pills, and he would later resell them to individuals who distributed them in Connecticut for as much as double the price. (*Id.*).

On December 8, 2008, Marte was arrested. (PSR ¶ 51). After his arrest, law enforcement agents obtained a search warrant and seized 550 pills of 80–milligram Oxycontin, 70 pills of 5–milligram Oxycodone (Endocet), and 240 pills of 10–milligram Oxycodone (Percocet) from Marte's residence. (*Id.* ¶ 52).

### B. *Prior Proceedings*

On December 8, 2008, Marte and thirteen others were charged with one count of conspiracy to distribute and possess with intent to distribute Oxycodone in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). (Indict. 1–2). All fourteen defendants, including Marte, pled guilty.

On September 8, 2009, Marte signed a plea agreement, which acknowledged that he "decided to plead guilty because he is in

---

1. Because "it plainly appears from [§ 2255] motion and ... the prior proceedings that [Marte] is not entitled to relief," I did not order the United States Attorney to file an answer to the instant motion. *See* Rules Governing § 2255 Proceedings for the U.S. District Courts, Rule 4(b). *See also Armienti v. United States*, 234 F.3d 820, 822–23 (2d Cir. 2000).

2. References are as follows: "Plea Agmt." refers to the plea agreement dated September 8, 2009; "Plea Tr." to the transcript of Marte's September 8, 2009 plea allocution; "PSR" to the Presentence Report dated December 1, 2009; "Sent. Tr." to the transcript of Marte's February 3, 2010 sentencing; "Indict." to the Second Superseding Indictment dated December 8, 2008; and "Pet. Mem." to Marte's memorandum in support of his § 2255 motion.

fact guilty." (Plea Agmt. 5). Additionally, pursuant to the agreement, Marte admitted to conspiring to distribute approximately 9,079 80–milligram and 4,970 40–milligram pills of Oxycontin. (Plea Agmt. 1). In his allocution before Magistrate Judge Kevin N. Fox, Marte admitted to distributing Oxycontin, which he bought and sold from May 2008 until November 2008. (Plea Tr. 15–16). Additionally, Marte's plea agreement contained a waiver of the right to appeal, which stated in relevant part:

It is agreed [ ] that the defendant will not file a direct appeal, nor litigate under Title 28, United States Code, Section 2255 and/or Section 2241, any sentence within or below the Stipulated Guidelines range. It is further agreed that any sentence within the Stipulated Guidelines range is reasonable. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein.

(Plea Agmt. 5).

The Probation Department prepared a presentence report on December 1, 2009 calculating a range under the United States Sentencing Guidelines (the "Guidelines") of 135 to 168 months' imprisonment. (PSR ¶ 4(g)). Pursuant to the Drug Equivalency Tables in the Guidelines, § 2D1.1 Application Note 10(E), the pills were equivalent to approximately 6,197 kilograms of marijuana, resulting in a base offense level of 34. (Id. ¶ 4(b)). Marte

received a three-level reduction for his timely plea and allocution. (Id. ¶ 4(d); Sent. Tr. 4). The PSR calculated his total offense level as 31 and his criminal history category as III. (PSR ¶ 4(e), (f)). Marte agreed to the Guidelines calculation but reserved the right to argue for a below-Guidelines sentence. (Plea Agmt. 4). Neither party filed an objection to the PSR. (PSR at 23 (Addendum)).

At Marte's sentencing on February 3, 2010, his attorney asked that I impose a non-Guidelines sentence as a result of a purported imbalance in the Drug Equivalency Tables with respect to Oxycodone, referencing his letter to the Court dated January 29, 2010. (Sent. Tr. 5). His attorney argued that heroin, rather than marijuana, should be used as the ratio equivalent drug because Oxycodone is "known as synthetic heroin and the chemical composition is" similar to that of heroin. (Id. at 6). If heroin had been used as the ratio equivalent drug as opposed to marijuana, the base offense level would have been 30 rather than 34. (Id.).[3] The government maintained that the original Guidelines calculations should be applied because of policy considerations. (Id. at 10). The government noted that one such consideration is that pills are often obtained with diverted Medicaid prescriptions. (Id.).

I sentenced Marte to 135 months' imprisonment, at the bottom of the Guidelines range. (Id. at 21). I considered the parties' arguments with respect to the

---

**3.** According to the Drug Equivalency Tables, one gram of Oxycodone is equivalent to 6,700 grams of marijuana. U.S.S.G. § 2D1.1, app. n. 10(E) (2010). In Marte's case, the pills were equal to approximately 6,197 kilograms of marijuana. (PSR ¶ 4(b)). According to § 2D1.1(c)(3) of the Guidelines, Marte's base offense level was a 34 because the equivalent weight of Oxycodone was in the range of 3,000 and 10,000 kilograms of marijuana.

Marte's trial attorney argued that the weight of the Oxycodone should have been converted to an equivalent weight in grams of heroin. This calculation would have resulted in an equivalent weight of 746 grams of heroin, which according to § 2D1.1(c)(5) would have yielded a base offense level of 30 because the weight in heroin would then have been between 700 grams and one kilogram of heroin.

Drug Equivalency Tables, and I also noted that while some co-defendants in the case were deserving of leniency, Marte was not because he was the ringleader of the conspiracy. (*Id.* at 19–20). Judgment was entered on February 9, 2010.

Marte filed a notice of appeal on February 11, 2010.[4] On April 26, 2010 Marte was assigned new appellate counsel, but he never filed a brief or appendix. On October 14, 2010 the Second Circuit deemed his appeal to be in default and dismissed his appeal. *United States v. Marte,* No. 10–523–cr (2d Cir. Sept. 30, 2010). This motion followed.

## DISCUSSION

### A. Timeliness

■ The Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a one-year statute of limitations on § 2255 habeas petitions that begins to run from "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f). Generally, if a defendant appeals his conviction and the Court of Appeals affirms the judgment on the merits, the judgment is not final until ninety days after the ruling. *Clay v. United States,* 537 U.S. 522, 525, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003).

Here, Marte filed his motion on April 4, 2011, more than a year after the entry of judgment on February 9, 2010. Although Marte filed a timely notice of appeal to the Second Circuit on February 11, 2010, his plea agreement explicitly barred him from directly appealing or collaterally attacking his sentence as long as he was sentenced at or below the stipulated Guidelines range. (Plea Agmt. 5). The timeliness of Marte's habeas petition thus depends on

whether his conviction became final one year after the Second Circuit terminated his appeal, in which case his motion is not time-barred, or one year after ten days after entry of the judgment, in which case his motion would be untimely.

There is little case law that addresses when a conviction becomes final when an appeal is dismissed for default and where a plea agreement expressly barred an appeal. One court has reasoned that "[w]here a defendant files an appeal but does not pursue it, a conviction becomes final no later than when the defendant withdraws his appeal or the Second Circuit dismisses it." *Martinez v. United States,* No. 10 Civ. 1398(NRB), 2010 WL 4840085, at *2 (S.D.N.Y. Nov. 10, 2010). Similarly, in *Caro v. United States,* the petitioner appealed his conviction but then withdrew his appeal with prejudice. The court looked at the latest possible date that his conviction became final-the date on which the mandate issued from the Second Circuit dismissing his appeal-and determined that his § 2255 motion was nonetheless time-barred. *Caro v. United States,* No. 09 Civ. 3120(GWG), 2009 WL 3273847, at *3 (S.D.N.Y. Oct. 14, 2009).

At least one decision reaches a contrary result. In *German v. United States,* the defendant appealed his conviction but later voluntarily withdrew his appeal because his plea agreement barred him from filing such an appeal. 209 F.Supp.2d 288, 292 (S.D.N.Y.2002). In determining that the defendant's conviction was final for purposes of AEDPA ten days after entry of judgment, the court reasoned that the defendant's § 2255 motion was time-barred because his appeal was "frivolous" and it was thus inconsistent with § 2255 to allow the petitioner to extend the limitations pe-

---

**4.** Marte initially filed a notice of appeal *pro se* on February 9, 2010 challenging his sentence, but the Second Circuit relied on the later notice of appeal filed by his trial counsel. *United States v. Marte,* No. 10–523–cr (2d Cir. Feb. 11, 2010), ECF No. 1 (Notice of Appeal).

riod by filing and then withdrawing a baseless appeal. *Id.* The court also noted, however, that the judgment of conviction is "theoretically subject to review by the Second Circuit, if only for the purpose of barring the appeal itself based on the Plea Agreement." *Id.*

Unlike the defendant in *German,* who was trying to extend the limitations period by filing and then withdrawing his appeal, there is no indication here that Marte was trying to extend the time limit by appealing. I conclude that Marte's conviction became final after his direct appeal terminated, on the date the Second Circuit dismissed the appeal.[5] Hence, Marte's habeas petition is timely.

## B. *Waiver of Rights*

█ It is well established that a defendant may waive his right to appeal by a plea agreement and that such waivers are generally enforceable. *See United States v. Gomez–Perez,* 215 F.3d 315, 318 (2d Cir.2000). Nonetheless, there are exceptions: a petitioner may challenge "the constitutionality of the process by which he waived those rights," *United States v. Hernandez,* 242 F.3d 110, 114 (2d Cir.2001), by showing that he entered into his plea agreement (1) involuntarily and unknowingly or (2) based on ineffective assistance of counsel. *Id.* at 113–14.

Here, neither exception applies. First, Marte does not assert that he entered into

his plea agreement unknowingly or involuntarily. Second, although Marte does argue that he received ineffective assistance in entering the plea agreement, as discussed below, his ineffective assistance of counsel claim fails. As Marte's sentence was within the stipulated Guidelines range, his waiver was valid.

Marte's claim of ineffective assistance of counsel appears to be a backdoor attempt to attack his sentence. In *United States v. Djelevic,* the Second Circuit held that a defendant's "effort to dress up his claim as a violation of the Sixth Amendment" fails if the defendant "in reality is challenging the correctness of his sentence under the Sentencing Guidelines," and a waiver in his plea agreement bars such a challenge. 161 F.3d 104, 107 (2d Cir.1998) (per curiam). The Court further held that if courts "were to allow a claim of ineffective assistance of counsel at sentencing as a means of circumventing plain language in a waiver agreement, the waiver of appeal provision would be rendered meaningless." *Id.*

Accordingly, Marte's substantive challenge to his sentence fails because his plea waiver is valid and he is barred from challenging his sentence.[6]

## C. *Ineffective Assistance of Counsel*

### 1. *Applicable Law*

To demonstrate ineffective assistance of counsel, Marte must satisfy the two-prong

---

**5.** This Court considers the date on which the Second Circuit's dismissal of Marte's appeal became effective, October 14, 2010, as the date Marte's conviction became final. Although the Second Circuit issued the mandate on December 29, 2010, this Court need not decide whether it affected the finality of his conviction because Marte filed his habeas petition on April 4, 2011, well within a year of either date.

**6.** In his memorandum of law, Marte argues that his sentence was unconstitutional, but

later concedes that this argument was waived because trial counsel did not preserve the objection prior to or at sentencing. (Pet. Mem. 2–3, 7). Marte argues that the Oxycodone sentencing scheme "violated [his] rights under the equal protection component of the due process clause of the Fifth Amendment" but then concedes the forfeiture of this argument because no "claim [was] made [by Marte's trial attorney] that sentencing pursuant to the oxycodone Guidelines violated Marte's [Fifth Amendment] rights." (*Id.*).

test established in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He must first demonstrate that his counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Id.* at 688, 104 S.Ct. 2052. In evaluating counsel's performance, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 687, 104 S.Ct. 2052. If counsel's performance was unreasonable, that alone does not warrant setting aside the judgment. *Id.* at 691, 104 S.Ct. 2052. Marte must next demonstrate under the second prong of the test that counsel's unreasonable performance prejudiced the defendant. *Id.* Marte "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

### 2. *Application*

■ Marte's ineffective assistance claim fails, for his trial counsel's performance did not fall below an objective level of reasonableness. First, Marte's attorney did challenge the Oxycodone sentencing scheme as applied here, and he was not required to further argue that the Guidelines were unconstitutional. Marte's trial counsel raised concerns regarding the Oxycodone sentencing scheme, both in a letter to the Court and on the day of sentencing in arguing for a below-Guidelines sentence. In his January 29, 2010 letter, Marte's counsel urged the Court to "adjust [Marte's] sentence downwardly given that the ratio calculations converting [O]xycontin to marijuana are wrong given the fair market value of each drug." (1/29/2010 Att'y Ltr. 4). He went on to further advocate that a just sentence could result if heroin were used as an equivalent drug to Oxycontin, as it is known as synthetic her-

oin, and as a result suggested a sentencing range of 78 to 97 months rather than 135 to 168 months. (*Id.* at 5). At sentencing on February 3, 2010, his counsel raised the same concerns. (Sent Tr. 5–6).

As a result, I asked the government to respond to the issue of using heroin as a ratio equivalent drug rather than marijuana. (Sent. Tr. 7). After this discussion with both parties, I was satisfied that there were policy reasons for adhering to Guidelines calculations based upon the existing conversion to marijuana. (Sent. Tr. 19).

As the Supreme Court noted in *Strickland*, there are "countless ways to provide effective assistance in any given case." 466 U.S. at 689, 104 S.Ct. 2052. "Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* Here, Marte's counsel challenged the propriety of the sentencing scheme. Although he did not couch his argument in constitutional terms, there was no reason for him to go that far. Marte was guilty, regardless of the constitutionality of the sentencing scheme, and it was reasonable for Marte's attorney to press for a below-Guidelines sentence by challenging the scheme without taking on the more difficult task of showing its unconstitutionality. Marte's counsel effectively brought to my attention his concerns regarding the Oxycodone sentencing scheme and he was not required to also challenge its constitutionality.

Second, Marte's trial attorney cannot be held ineffective for failing to assert a legal theory that had not been accepted by any court. Marte raises two constitutional challenges, contending that: (1) the 2003 amendment to the Guidelines, Amendment 657, calculating the marijuana equivalency of Oxycodone based upon the weight of the actual Oxycodone contained in the pill,

rather than the gross weight of the pill, violated the Equal Protection component of the Due Process Clause; and (2) assigning a marijuana equivalent to Oxycodone rather than a heroin equivalent, by weight, is also irrational under the Due Process Clause. (Pet. Mem. 8–13).

Marte concedes, however, that the Second Circuit has never addressed the constitutionality of the conversion of Oxycodone to marijuana in the Sentencing Guidelines. (Pet. Mem. 13). In fact, only one court, the First Circuit, has addressed this issue and even then it rejected the first argument and did not reach the second argument. *United States v. Ekasala,* 596 F.3d 74, 75 (1st Cir.2010).

In *Ekasala,* which was decided after Marte's guilty plea and sentencing, the First Circuit determined that the Sentencing Guidelines amendment changing the weight calculation of Oxycodone from gross to pure weight had a rational basis and was constitutional, but did not reach the constitutionality of "attaching a higher marijuana equivalent, and resulting higher base offense, to oxycodone than to an equal weight of heroin." 596 F.3d at 75–76.

No court has determined that these aspects of the Guidelines are unconstitutional. The Second Circuit has held that "[c]ounsel is not obliged to advance every nonfrivolous argument that could be made." *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir.2001); *cf. United States v. Canniff,* 521 F.2d 565, 573 n. 7 (2d Cir.1975) (holding that petitioner's attorney's "failure to anticipate . . . an advance in the law, even though not wholly unanticipated," does not constitute ineffective assistance of counsel).

As no case law supporting these constitutional challenges existed, it was not unreasonable for Marte's trial attorney to fail to raise the constitutionality of the Sentencing Guidelines's conversion of Oxycodone to marijuana. *Cf. United States v. Prince,* 110 F.3d 921, 926 (2d Cir.1997) (noting that petitioner failed to show that the Second Circuit had ever addressed the sentencing issue he argued his counsel should have raised, and holding that counsel was not ineffective). As a result, Marte's trial attorney cannot be deemed ineffective for failing to raise these arguments.

Because Marte has not established the first prong of the *Strickland* test, I do not reach the prejudice prong.

### CONCLUSION

For the reasons set forth above, Marte has failed to demonstrate any basis for relief under 28 U.S.C. § 2255. The motion is therefore denied. Because Marte has not made a substantial showing of the denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2) (as amended by AEDPA). I certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal taken from this decision and order would not be taken in good faith.

SO ORDERED.

**UNITED STATES of America,**

v.

**RUBIN/CHAMBERS, DUNHILL INSURANCE SERVICES, et al., Defendants.**

**No. 09 Cr. 1058.**

United States District Court, S.D. New York.

July 20, 2011.

Rebecca Meiklejohn, Steven Tugander, Kevin Bradford Hart, U.S. Dept. of Justice, New York, NY, Lucy Pepe McClain, Philadelphia, PA, for United States of America.

Bradley Drew Simon, Adam Stewart Katz, Brian David Waller, Simon & Partners LLP, John Joseph Kenney, Laura B. Hoguet, Hoguet Newman Regal & Kenney, LLP, Juan Alden Skirrow, Willkie Farr & Gallagher LLP, Michael Gerard McGovern, Steven S. Goldschmidt, Ropes & Gray, LLP, Daniel Louis Zelenko, Shamiso Kristen–Faith Maswoswe, Crowell & Moring LLP, New York, NY, Donald Etra, Donald Etra, Law Office, Los Angeles, CA, Richard William Beckler, Howrey LLP, Washington, DC, Jeffrey H. Rutherford, Crowell & Moring LLP, San Francisco, CA, for Defendants.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Defendants Rubin/Chambers, Dunhill Insurance Services, Inc. ("CDR"); David Rubin ("Rubin"); Zevi Wolmark a/k/a Stewart Wolmark ("Wolmark"); and Evan Andrew Zarefsky ("Zarefsky") (collectively, "Defendants") were indicted on October 29, 2009 and charged with crimes arising out of an alleged conspiracy by Defendants and others to illegally rig bids, fix prices and manipulate the market for investment instruments known as municipal derivatives. On December 7, 2010, the Government filed a superseding indictment (the "Indictment") alleging nine counts in total. All Defendants were charged as follows in the first six counts: Count One alleges conspiracy to restrain trade, in violation of 15 U.S.C. § 1; Count Two alleges conspiracy to violate 18 U.S.C. §§ 1343, 1346 and 1005 (respectively, "§ 1343", "§ 1346" and "§ 1005"), in violation of 18 U.S.C. § 371; Count Three alleges conspiracy to violate §§ 1343 and 1346, in violation of 18 U.S.C. § 371; and Counts Four through Six allege wire fraud, in violation of §§ 1343 and 1346. Further, Count Seven charges Zarefsky alone with one count of making false statements, in violation of 18 U.S.C. § 1001 ("§ 1001"); Count Eight charges Rubin, Wolmark and Zarefsky with interfering with the administration of internal revenue laws, in violation of 26 U.S.C. § 7212(a); and Count Nine charges Rubin alone with making fraudulent bank transactions, in violation of § 1005. In addition, Counts Two through Six contain language charging Defendants with a version of honest services fraud (the "Honest Services Allegations"), in violation of § 1346.

Defendants now move, jointly and separately, pursuant to Federal Rules of Criminal Procedure 12(b) ("Rule 12(b)") and 7(d) to dismiss or strike certain parts of the Indictment. Specifically, Defendants move jointly for an order dismissing Counts Two through Six to the extent the Honest Services Allegations contained therein are based on "the concealment of material information," or, in the alternative, striking the language "the concealment of material information" from the Honest Services Allegations as surplusage (the "Joint Motion"). Defendants also move jointly (1) to dismiss Count Nine, which charges Rubin individually with violating § 1005; and (2) to strike those portions of Count Two that charge Defendants with violating § 1005 (together, the "§ 1005 Motion"). Lastly, Zarefsky moves individually to dismiss Count Seven for improper venue ("Zarefsky's Motion").

For the reasons discussed below, the Court DENIES the Joint Motion, GRANTS the § 1005 Motion and DENIES Zarefsky's Motion.

## I. BACKGROUND [1]

Corporate defendant CDR marketed financial products and services, and served as a broker between municipalities ("issuers"), on the one hand, and various banks ("providers"), on the other. Rubin served as CDR's founder and Chief Executive, Wolmark was CDR's Chief Financial Officer and Zarefsky was a Vice President of CDR. In its role as a broker, CDR assisted its municipal issuer clients with investing the proceeds of municipal bond issues in investment agreements offered by major financial institution providers. Issuers hire brokers like CDR to act as their agents in conducting the competitive bidding procedures through which those issuers select providers. The broker's fee for conducting such an auction is generally paid by the winning provider, who takes the fee into account when calculating its bid and discloses the fee to the issuer.

The Indictment alleges that from 1998 until at least November 2006, the Defendants conspired with certain providers to circumvent the competitive bidding process by controlling and manipulating auctions in order to maximize profits for both CDR and the co-conspirator providers. According to the Indictment, this manipulation artificially determined and suppressed price levels at the expense of the issuers, and sometimes the federal treasury. Specifically, the Indictment alleges that CDR and its coconspirator providers: agreed among themselves which provider would win a particular auction and at what price; submitted intentionally losing "courtesy" bids in order to make auctions appear competitive, with the understanding that a losing provider would be allocated other business in the future; and permitted co-conspiring providers "last looks" in the auctions, i.e., information about prices, price levels and conditions about other providers' bids to use in determining their own bids. Finally, the Indictment alleges that Defendants falsely certified that the auctions complied with relevant federal regulations and were otherwise competitive. In exchange for its role in manipulating the bidding process in this way, the Indictment alleges that CDR received kickbacks from favored providers that were not disclosed to the issuers or government regulators.

On November 15, 2006, as part of an ongoing investigation conducted by the United States Department of Justice's Antitrust Division ("Antitrust Division"), agents of the Internal Revenue Service ("IRS") and the Federal Bureau of Investigation ("FBI") executed a search warrant at CDR's office in Beverly Hills, California and served the company with a subpoena issued by a Southern District of New York grand jury. At or about the time that this search was occurring, two Manhattan-based federal agents interviewed Zarefsky at a coffee shop near CDR's office in Beverly Hills. During that interview, Zarefsky told the agents that he did not give "last looks" to providers, nor did he have any first-hand knowledge with respect to "last looks" or "courtesy bids." The Indictment alleges these statements Zaref-

---

1. The following factual summary is derived from the Indictment (Docket No. 67); the Declaration of Daniel L. Zelenko dated May 9, 2011 in support of Defendant Evan Zarefsky's Motion to Dismiss Count Seven for Improper Venue and exhibits attached thereto (Docket No. 128); and the Government's Memorandum of Law in Opposition to Defendants' Motions to Dismiss and to Strike (Docket No. 135). Except where otherwise noted, no further reference to these sources will be made.

sky made to the federal agents were false. The statements were recorded as hand-written notes at the time of the interview and then further memorialized nine days later in a report prepared in the Southern District of New York once the agents had returned from California. The report was then provided to the Antitrust Division in its New York office.

## II. DISCUSSION

### A. *LEGAL STANDARD*

■■■ "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). On a pretrial motion to dismiss pursuant to Rule 12(b), the Court accepts the allegations in the indictment as true, *see United States v. Goldberg,* 756 F.2d 949, 950 (2d Cir.1985), and focuses on the legal sufficiency of the indictment itself, without ruling on the legal sufficiency of the evidence or contrary assertions of fact. *See United States v. Alfonso,* 143 F.3d 772, 776–77 (2d Cir. 1998). "An indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.1975). Further, an indictment must be read with "common sense," considering those "facts which are necessarily implied by the specific allegations made." *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.1992).

"Upon the defendant's motion, the court may strike surplusage from the indictment or information." Fed.R.Crim.P. 7(d). However, "it has long been the policy of courts within the Southern District [of New York] to refrain from tampering with indictments." *United States v. Bin Laden,* 91 F.Supp.2d 600, 621 (S.D.N.Y.2000) (internal quotation marks omitted). As the Court of Appeals for the Second Circuit has cautioned, "motions to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory and prejudicial.'" *United States v. Hernandez,* 85 F.3d 1023, 1030 (2d Cir.1996) (*quoting United States v. Scarpa,* 913 F.2d 993, 1013 (2d Cir.1990)). Where "evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Scarpa,* 913 F.2d at 1013 (internal quotation marks omitted).

■■ The government bears the burden of demonstrating, by a preponderance of the evidence, that venue is proper. *See United States v. Ramirez,* 420 F.3d 134, 139 (2d Cir.2005). Evidence as to venue must be viewed in the light most favorable to the government, crediting every inference that might be drawn in its favor. *See id.*

### B. *THE JOINT MOTION*

■■ In their Joint Motion, Defendants contend that certain language in the Honest Services Allegations charging them with the "concealment of material information" is unconstitutionally vague in light of the Supreme Court's decision in *Skilling v. United States,* —— U.S. ——, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010). Defendants assert that Counts Two through Six must therefore be dismissed, or, in the alternative, that the offending language should be stricken from the Indictment. The Court disagrees.

The Honest Services Allegations in Counts Two through Six allege, in relevant part,

having devised and intending to devise a scheme and artifice to defraud ... and further to deprive municipal issuers of the intangible right to the honest and faithful services of the CDR Defendants and co-conspirators at CDR *through kickbacks and the concealment of material information,* ... [Defendants] would and did transmit and cause to be transmitted by means of wire, radio or television in interstate or foreign commerce any writings, signs, signals, pictures or sounds, in violation of Title 18. United States Code, Sections 1343 and 1346.

Indictment ¶ 31 (emphasis added); *see also id.* at ¶¶ 45, 58.

Defendants assert that these allegations should be read as setting forth two separate and independent theories of honest services fraud, namely, one based upon the alleged provision of kickbacks and another based upon the alleged concealment of material information. Yet under *Skilling,* the Defendants contend, allegations that a defendant engaged in "schemes of non-disclosure and concealment of material information" are unconstitutionally vague and may not serve as an independent basis for conviction under § 1346.

To the extent that the Honest Services Allegations can be read to allege a single theory of criminal activity encompassing both kickbacks and the concealment of activity related to those kickbacks, however, they are clearly permissible under *Skilling. See* 130 S.Ct. at 2933 ("[I]t has always been plain as a pike staff that bribes and kickbacks constitute honest services fraud."); *United States v. Rybicki,* 354 F.3d 124, 142 (2d Cir.2003) (holding that a scheme to bribe insurance adjusters in order to expedite insurance claims that was "accompanied by material omission[s]" fell squarely within the ambit of § 1346). Read together with the remainder of Counts Two through Six, which deal directly with the structure of the alleged bid rigging and kickbacks scheme and allege that Defendants failed to inform issuers about those kickbacks, the challenged language is easily susceptible to such an interpretation. *See United States v. Seminerio,* No. 08 Cr. 1238, 2010 WL 3341887, at *7 (S.D.N.Y. Aug. 20, 2010) ("While these passages ... undoubtedly charged Seminerio with intentionally concealing a conflict of interest, they at the same time make clear that the concealed conflict was Seminerio's secret solicitation and receipt of *bribes.* Thus the Indictment survives *Skilling* and Seminerio's vagueness challenge fails." (emphasis in original)).

■ An indictment need only "fairly inform[ ] a defendant of the charge against which he must defend," *Hamling,* 418 U.S. at 117, 94 S.Ct. 2887, and, in this regard, the Honest Services Allegations, when read to allege a single theory of kickbacks and their concealment, suffice. Even were the Court to accept Defendants's argument that the "concealment of material information" language is redundant because the term "kickbacks" necessarily entails concealment, surplusage may be stricken from an indictment only where it is irrelevant to the crime charged, inflammatory and prejudicial. *See Hernandez,* 85 F.3d at 1030. Here, the alleged concealment was part and parcel of the alleged kickback scheme and evidence of such concealment could be relevant to proving intent to defraud under § 1346. Further, the language is not inflammatory, and any potential for juror confusion stemming from grammatical ambiguity may be remedied through a proper jury charge. Defendants' Joint Motion is therefore denied.

## C. *THE § 1005 MOTION*

Turning next to the Defendants' § 1005 Motion, the Court finds itself presented with a more involved set of questions.